2014 OK 1

**STATE of Oklahoma EX REL. OKLAHOMA BAR ASSOCIATION, Complainant,**

v.

**Tom J. WILCOX, Respondent.**

**SCBD Nos. 5775, 6009.**

Supreme Court of Oklahoma.

Jan. 14, 2014.

---

Gina L. Hendryx, General Counsel, and
Stephen L. Sullins, Oklahoma Bar Associa-

tion, Oklahoma City, Oklahoma, for Complainant.

Thomas Joseph Wilcox, Clinton, Oklahoma, pro se.

Lou Keel, Oklahoma City, Oklahoma, for Respondent.

COMBS, J.

¶ 1 Thomas Joseph Wilcox (hereinafter, Wilcox), OBA No. 10153, was admitted to practice law in the State of Oklahoma on April 22, 1983. Wilcox is currently suspended re: SCBD 5775 pursuant to Rule 7.3 of the Rules Governing Disciplinary Proceedings (RGDP), 5 O.S. Supp.2007 Ch. 1, App. 1–A by order of this Court in *State of Oklahoma Bar Ass'n v. Wilcox*, 2011 OK 70, 261 P.3d 605. There are two pending matters concerning Wilcox which need to be resolved. The first, SCBD 6009, concerns a complaint brought by the Oklahoma Bar Association pursuant to Rule 6 of the RGDP asserting the Wilcox violated provisions of the Oklahoma Rules of Professional Conduct (ORPC) during the course of his representation of a particular client during a workers' compensation matter. The second, SCBD 5775, was commenced pursuant to Rule 7 of the RGDP and concerns Wilcox's criminal conviction for the misdemeanor crime of stalking, in violation of 21 O.S. 1173(A). These matters were previously joined for the purpose of holding a hearing before a trial panel of the Professional Responsibility Tribunal (PRT), and in the interest of judicial economy are now resolved by a single opinion of the Court.

## JURISDICTION AND STANDARD OF REVIEW

¶ 2 In Oklahoma, the regulation of licensure, ethics, and discipline of legal practitioners is a non-delegable, constitutional responsibility of this Court. *State ex rel. Oklahoma Bar Ass'n v. McArthur*, 2013 OK 73, ¶ 4, 318 P.3d 1095, 2013 WL 5316297; *State ex rel. Oklahoma Bar Ass'n v. Albert*, 2007 OK 31, ¶ 11, 163 P.3d 527. In disciplinary proceedings this Court acts as a licensing court in the exercise of our exclusive original jurisdiction. *State ex rel. Oklahoma Bar Ass'n v. Garrett*, 2005 OK 91, ¶ 3, 127 P.3d

600; *State ex rel. Oklahoma Bar Ass'n v. Taylor*, 2003 OK 56, ¶ 21, 71 P.3d 18. This Court conducts a de novo review of the record in order to determine if misconduct has occurred and what discipline is appropriate. *McArthur*, 2013 OK 73, ¶ 4, 318 P.3d 1095; *Garrett*, 2005 OK 91, ¶ 3, 127 P.3d 600. Before this Court may impose discipline upon an attorney, the charges must be established by clear and convincing evidence. *State ex rel. Oklahoma Bar Ass'n v. Miller*, 2013 OK 49, ¶ 10, 309 P.3d 108; *State ex rel. Oklahoma Bar Ass'n v. Wolfe*, 1997 OK 47, ¶ 11, 937 P.2d 988. To make such a determination, this Court must be presented with a record sufficient to permit an independent, on-the-record review for the crafting of appropriate discipline. *State ex rel. Oklahoma Bar Ass'n v. McCoy*, 2010 OK 67, ¶ 6, 240 P.3d 675; *State ex rel. Oklahoma Bar Ass'n v. Schraeder*, 2002 OK 51, ¶ 6, 51 P.3d 570. It is the view of this Court that the record before us is sufficient to make such a determination.

## I.

### PRIOR DISCIPLINARY HISTORY

¶ 3 This is not the first time that Wilcox has been the subject of disciplinary proceedings before this Court for violations of the ORPC, and a preliminary examination of his disciplinary history is necessary at this juncture because some of the underlying facts are directly related to the matters currently before this Court. Wilcox was first subjected to discipline by this Court in *State v. Wilcox* (hereinafter *Wilcox I* ), 1997 OK 87, 942 P.2d 205. The genesis of the proceeding occurred when a clinic in Oklahoma complained to the OBA after it had received six checks drawn on Wilcox's trust account which were returned for insufficient funds. *Wilcox I*, 1997 OK 87, ¶ 3, 942 P.2d 205. In its complaint, the OBA alleged that Wilcox violated rules 1.15 and 8.4 of the ORPC, 5 O.S.1991, Ch. 1, App. 3A, and Rules 1.4 and 5.2 of the RGDP, 5 O.S.1991, Ch. 1, App. 1–A. *Wilcox I*, 1997 OK 87, ¶ 1, 942 P.2d 205.

¶ 4 This Court excluded some evidence after making a determination that the PRT improperly coerced Wilcox's testimony, after

he had asserted the protection of Rule 6.11(d) of the RGDP. *Wilcox I*, 1997 OK 87, ¶ 20, 942 P.2d 205. After considering the remaining evidence, this Court determined that Wilcox had either commingled trust account funds or mishandled his clients' funds. The Court also determined that an endorsement on a settlement check was unauthorized. As a result, the Court determined clear and convincing evidence showed that Wilcox violated Rules 1.15 and 8.4 of the ORPC and Rule 1.4 of the RGDP. *Wilcox I*, 1997 OK 87, ¶ 26, 942 P.2d 205. This Court suspended Wilcox from the practice of law for one year, and imposed costs. *Wilcox I*, 1997 OK 87, ¶ 29, 942 P.2d 205.

¶ 5 Wilcox was subjected to discipline a second time by this Court in *State ex rel. Oklahoma Bar Ass'n v. Wilcox* (hereinafter *Wilcox II* ), 2009 OK 81, 227 P.3d 642. The OBA initiated proceedings under Rule 6 of the ORPC, alleging twelve different counts of misconduct and recommending a private reprimand. *Wilcox II*, 2009 OK 81, ¶ 1, 227 P.3d 642. The Professional Responsibility Tribunal found generally that Wilcox violated the ORPC and recommended a public reprimand and one-year probation. *Wilcox II*, 2009 OK 81, ¶ 1, 227 P.3d 642. After de novo review, this Court determined that Wilcox had violated Rules 1.15(b), 1.16(d), and 8.2(a) of the 2001 ORPC and Rule 5.2 of the 2001 RGDP. *Wilcox II*, 2009 OK 81, ¶ 70, 227 P.3d 642. This Court ordered a public reprimand, but declined to impose costs on Wilcox for multiple reasons, including unjustified delay on the part of the OBA and failure on its part to prove by clear and convincing evidence the majority of the charges it levied against Wilcox. *Wilcox II*, 2009 OK 81, ¶¶ 69–70, 227 P.3d 642.

¶ 6 One of the violations this Court disciplined Wilcox for in *Wilcox II* is particularly relevant to Wilcox's criminal conviction for stalking that is the subject of *State ex rel. Oklahoma Bar Ass'n v. Wilcox*, SCBD 5775, the current Rule 7 proceeding involving Wilcox that is now before this Court and discussed infra. In *Wilcox II*, this Court deter-

mined that Wilcox violated Rule 8.2(a) of the ORPC, which prohibits a lawyer from making a false statement about a judicial candidate with knowledge or with reckless disregard of the statement's truth. *Wilcox II*, 2009 OK 81, ¶ 59, 227 P.3d 642. In a letter opposing a candidate for Associate District Judge of Dewey County, Wilcox called into question the candidate's ethics because the candidate filed a campaign form after the deadline.[1] *Wilcox II*, 2009 OK 81, ¶ 58, 227 P.3d 642. Wilcox also asserted the candidate had terminal cancer, and while it was true that the candidate had cancer, it was not true that the cancer was terminal. *Wilcox II*, 2009 OK 81, ¶ 58, 227 P.3d 642. Wilcox sent out this letter to voters less than one week before the election. *Wilcox II*, 2009 OK 81, ¶ 58, 227 P.3d 642. The judicial candidate in question was Rick Bozarth, then (and currently) the husband of Taunia Bozarth, the victim of Wilcox's stalking conviction discussed infra.

¶ 7 An order of suspension was also issued for Wilcox by this Court on June 20, 2013, due to Wilcox's failure to pay bar dues for the 2013 calendar year. *Matter of Suspension of Members of the Oklahoma Bar Association for Nonpayment of 2013 Dues*, 2013 OK 46.

## II.

### STATE OF OKLAHOMA EX REL. OKLAHOMA BAR ASSOCIATION v. THOMAS J. WILCOX, SCBD 6009— RULE 6

¶ 8 On May 6, 2013, The OBA filed a Complaint against Wilcox pursuant to Rule 6 of the ORPC, 5 O.S. Supp.2008, Ch. 1, App. 3–A. The OBA alleged that in the course of representing a particular client, Darlene Faye Love (hereinafter, Love), Wilcox committed acts constituting professional misconduct in violation of the ORPC, 5 O.S.2001, Ch. 1, App. 3–A; the ORPC, 5 O.S. Supp. 2008, Ch. 1, App. 3–A; and the RGDP, 5 O.S.2001, Ch. 1, App. 1–A. Specifically, the OBA asserts Wilcox violated Rules 1.1, 1.3,

---

1. The form had been filed after the deadline, but with the consent and approval of election offi-

cials. *Wilcox II*, 2009 OK 81, ¶ 58, 227 P.3d 642.

1.8(e), 1.15, 3.3(a)(3), and 8.4(c) of the ORPC and Rule 1.3 of the RGDP. The OBA also sought enhancement of discipline in its complaint, based upon prior disciplinary actions taken against Wilcox, discussed briefly supra.

¶ 9 On May 29, 2013, this Court granted the OBA's motion for joinder for the limited purpose of holding the hearing before the PRT, in the interest of judicial economy. The hearing before the PRT occurred on August 29, 2013, and September 3, 2013. The Trial Panel filed its Report concerning both the Rule 7 and Rule 6 matters with this Court on October 4, 2013.

### A. Facts and Procedural Background

¶ 10 Wilcox's client, Love, suffered an injury while working as a practical nurse at the psychiatric ward at OU Medical on July 13, 2003. Transcript of the Hearing before the Professional Responsibility Tribunal (hereinafter, Transcript), p. 253. She discovered a patient hanging from a shower stall, and when she attempted to aid him suffered an injury to her back. Transcript, p. 253. Love reported the injury to her employer and began receiving temporary total disability benefits. Transcript, p. 254.

¶ 11 Upon discovering that she might need surgery, Love considered hiring an attorney and eventually hired Wilcox. Transcript, p. 254–55. Pursuant to an agreement for attorney fees signed by Love and Wilcox, it appears she retained his service in early December of 2003. Complainant's Exhibit 9. While represented by Wilcox, Love had two more surgeries and travelled regularly from her home in Woodward to Oklahoma City for the purpose of seeing physicians. Transcript, p. 257–58.

¶ 12 Wilcox continued to represent Love between 2003 and 2007. On June 4, 2007, Wilcox filed a motion to set Love's workers' compensation case for trial on the issue of permanent partial disability. Complainant's Exhibit 18. The final hearing was set for August 8, 2007. The day prior to the hearing, Love learned that Wilcox had suffered a stroke. Transcript, pp. 269–70. The record

indicates that Wilcox was admitted to the hospital on July 27, 2007, and discharged on August 11, 2007. Complainant's Exhibit 22.

¶ 13 Upon learning of Wilcox's illness and inability to appear at the final hearing, Love obtained the services of attorney Joseph Talbot in August 2007, who took over representation of her in her workers' compensation case. Talbot obtained a continuance of Love's trial and represented her through the remainder of the workers' compensation proceedings. Transcript, pp. 185–86. During the course of his representation of Love, Talbot became aware that Wilcox, during the time he was representing Love, may have violated provisions of the ORPC, and he reported his concerns to the OBA. Transcript, pp. 183–84; Complainant's Exhibit 8.

¶ 14 In September of 2007, after Talbot had taken over Love's case, Wilcox filed a notice of attorney's lien. After Talbot settled the case, Wilcox indicated he was seeking reimbursement for both travel expenses he had advanced to Love, as well as medical expenses he incurred for three physicians. Judge Farrar of the Workers' Compensation Court held a hearing on the division of attorney fees and costs between Wilcox and Talbot on September 22, 2011, included in the record as Complainant's Exhibit 8. This was also the genesis of the OBA's Rule 6 Complaint against Wilcox, as Talbot forwarded them the transcript, concerned that Wilcox had admitted to violating the ORPC.

¶ 15 During the September 22, 2011, hearing the Workers' Compensation Court was highly critical of Wilcox's failure to seek reimbursement on Love's behalf from the insurer, for expenses incurred travelling to and from medical appointments. In an order issued on December 19, 2011, the Workers' Compensation Court determined that: 1) Wilcox advanced funds to Love in violation of Rule 1.8 of the ORPC; 2) Wilcox was not, at the time of the order, entitled to reimbursement of those funds; and 3) that Wilcox failed to prove he had incurred expenses with two of Love's treating physicians.[2] Wilcox

---

**2.** It is worth noting that this is not the first time Wilcox was informed by a court that advancing funds for travel to appointments to his clients

might violate Rule 1.8 of the ORPC. He was informed of this in an order of the Workers' Compensation Court issued on October 3, 2006,

appealed the decision of the Workers' Compensation Court, and the decision was affirmed by the Oklahoma Court of Civil Appeals, Division IV, in an unpublished opinion: *In Re Claim of: Darlene Faye Love v. Robinson Medical Resources Group et al. v. Daniel Talbot v. Tom Wilcox,* Case No. 110,-271, Complainant's Exhibit 12.

¶ 16 The issue of Wilcox's lien came before the Workers' Compensation Court a second time, on March 26, 2013, after Wilcox apparently became aware of a second settlement in Love's case. Complainant's Exhibit 13. In an order on March 28, the Workers' Compensation Court determined that 1) Wilcox's lien had been satisfied and was extinguished; and 2) that Wilcox was ordered to reimburse Love $2,640.00 in previously awarded temporary total disability benefits that Wilcox had withheld. Wilcox has also appealed this determination, which is currently pending before the Court of Civil Appeals, Case No. 111,682.

## B. Analysis

### 1) Rules 1.1 and 1.3 of the ORPC

¶ 17 The OBA alleges that Wilcox violated Rules 1.1 and 1.3 of the ORPC during the course of his representation of Darlene Love. Rule 1.1 of the ORPC, 5 O.S.2001, Ch. 1, App. 3–A provides:

A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation.

Rule 1.3 of the ORPC, 5. O.S.2001, Ch. 1, App. 3–A provides:

A lawyer shall act with reasonable diligence and promptness in representing a client.

¶ 18 In its complaint, the OBA alleges that Love made numerous out of town trips to receive medical treatment, and was therefore entitled to mileage reimbursement from her insurance carrier, but that Wilcox "failed to submit Love's mileage claims to the insur-

ance carrier." Complaint, 6. In its Brief in Chief, the OBA also asserts that:

The evidence indicates that Respondent did not track, document, or monitor Love's mileage claims during the time he represented her. It is uncontested that Respondent did not submit mileage claims during the months or years as they were incurred. Respondent testified that his practice was to submit the mileage reimbursement claim towards the end of the case. He said that Love verbally agreed to same. Complainant's Brief in Chief, p. 6.

¶ 19 The PRT determined that the OBA failed to show by clear and convincing evidence that Wilcox violated either Rule 1.1 or 1.3. After reviewing the evidence, we disagree with the PRT. It is undisputed from the record that Wilcox did not request reimbursement for Love's travel expenses as they were incurred. The OBA asserts that because Love was broke and needed those reimbursements, and the lack of them presented a significant hardship for her, Wilcox violated Rules 1.1 and 1.3 by not seeking reimbursements at earlier intervals, as was apparently the practice of Talbot, who took over representation of Love after Wilcox.

¶ 20 The PRT determined that while requesting reimbursement earlier over the course of the representation might have been the better practice, Wilcox argued he made an agreement with Love to advance her funds as needed to cover travel expenses, and that he would be repaid at the end of the case. Love testified that she did not make that agreement with Wilcox, but the record does indicate that she accepted funds from Wilcox given to her for that purpose.

¶ 21 As the PRT correctly points out, it would make little sense for Wilcox to have advanced Love funds without an agreement that he would ultimately be reimbursed for them, and it would make equally little sense for Love to assume the money was a gift she had no obligation to repay. It is clear from the record that: 1) Wilcox did not seek reimbursement for Love's travel expenses from the insurer when he probably should have;

in a different matter, *In Re Claim of: Leroy James Sadler,* No. 2002–16046Y, Complainant's

Exhibit 15.

2) instead he advanced funds to Love as needed to cover her travel expenses; and 3) there is conflicting evidence concerning whether Wilcox and Love agreed to this arrangement.

¶ 22 However, the record also indicates that Wilcox's file, when it was eventually turned over to Talbot after Talbot issued a subpoena on December 18, 2007, did not contain complete medical records for Love sufficient to submit a claim for reimbursement. Transcript, pp. 202–203. Talbot testified before the PRT that he had to request medical records from providers because he was not able to obtain the materials from Wilcox. Transcript, p. 202. The record before us indicates that not only did Wilcox not submit timely requests for mileage reimbursement during his representation of Love, he was both unprepared to do so at the end of his representation of her, and lack of diligence impacted Talbot's ability to obtain reimbursement for Love after he took over the representation subsequent to Wilcox's illness.

¶ 23 Wilcox admits that he did not document the mileage that was incurred by Love over the course of his representation. During the hearing before the Professional Responsibility Tribunal, Wilcox was asked:

Q: But I'm looking for an entry where you specifically say, I spent three hours, four hours, five hours documenting the mileage that was incurred by Ms. Love for her treatment during the time that you represented her from 2003 until 2007?

A: I didn't, because it wasn't done at the—at any point in my representation because I got sick that last week or two.

Transcript, p. 303

In a hearing before the Workers' Compensation Court on September 22, 2011, Wilcox testified that he failed to seek reimbursement for Love because he did not have time:

THE COURT: While you're thumbing through figuring out your questions, I have a question.

Why did you keep the Claimant's—five of the Claimant's TTD checks to reimburse yourself for so-called mileage advancements? Why didn't you just go ahead and just ask the insurance company to pay for those mileage advancements?

THE WITNESS: Because usually what would happen I would get a call a day or two before her trip to see a doctor. She would tell me, Mr. Wilcox, I need money to go see my doctor. And usually I would have to get the check in the mail that day, the money order in the mail that day, to get it to her so that she would have it to her before she would see her doctors. And there wasn't enough time to file a request for that.

THE COURT: Why didn't you file that after the fact? You had four years of allegedly providing those advancements, which are specifically prohibited by our Rules of Professional Conduct. But nonetheless, you had plenty of time to ask for reimbursements for those. Why did you never do that?

THE WITNESS: Judge, I have so much time in my life along with Ms. Love and the rest of my clients I have—

. . . .

THE COURT: Just tell me why you didn't apply.

THE WITNESS: Because I didn't have the time to do it. And she would call me usually two or three days before.

Complainant's Exhibit 8, pp. 88–89.

¶ 24 During this time period, it appears from the record that Wilcox was aware of Love's precarious financial situation. Transcript, p. 343. He was in fact loaning her money for transportation to and from medical appointments because she was unable to afford it, and at the same time made no effort to obtain reimbursement, which he acknowledges he knew Love was entitled to, from the insurer. Transcript, pp. 291–92. We hold, therefore, that clear and convincing evidence in the record exists to show that Wilcox violated Rules 1.1 and 1.3 of the ORPC by failing to provide competent representation, with reasonable diligence and promptness, to Love over the course of the representation.

## 2) Rule 1.8(e) of the ORPC

¶ 25 The OBA also asserted that Wilcox violated Rule 1.8(e) of the ORPC by advancing funds to Love for the purpose of enabling her to travel to medical appointments. The PRT determined that the OBA demonstrated by clear and convincing evidence that Wilcox did violate Rule 1.8(e). We agree with the determination of the PRT, and hold that Wilcox's advancement of funds to Love to enable her to travel to medical appointments was a violation of Rule 1.8(e). The version of the rule in effect at the time of Wilcox's alleged violations is Rule 1.8(e), ORPC, 5 O.S.2001, Ch. 1, App. 3–A, and provides:

> A lawyer shall not provide financial assistance to a client in connection with pending or contemplated litigation, except that a lawyer may advance court costs and expenses of litigation, the repayment which may be contingent on the outcome of the matter.[3]

¶ 26 For the purposes of Rule 1.8(e), travel expenses to and from workers' compensation appointments are not court costs or expenses of litigation. Wilcox testified that he advanced funds to Love repeatedly to cover her travel to medical appointments. Despite being generally aware of Rule 1.8(e), respondent testified that he made no effort to determine if his loans to Love might be in violation of the rule. Transcript, pp. 418–21.

¶ 27 Wilcox was informed back in 2006 that his practice of advancing money to clients for transportation to medical appointments violated Rule 1.8 in an order by the Workers' Compensation Court in a different matter, *In Re Claim of: Leroy James Sadler*, No. 2002–16046Y, Complainant's Exhibit 15. The Court held that: "attorney Wilcox was prohibited by the ethics code from loaning the claimant funds for mileage and medications. These are not costs of litigation." Complainant's Exhibit 15, p. 2; Transcript, p. 381. Wilcox testified that after that order was affirmed on appeal, he changed his practices. Transcript, p. 381. However, Wilcox acknowledged that he advanced money to Love after the Order in the Sadler case, while the appeal was pending:

Q: Do you agree with me that that order, October 3rd, 2006, was prior to the two checks you sent Darlene Love for $750 each?

A: That order pertained to Leroy Sadler's case.

Q: But my question is, this order telling you it's improper to advance mileage costs in a workers' compensation case came out before you sent those two money orders to Ms. Love in 2007?

A: That's right, in regard to Leroy Sadler.

Transcript, p. 383.

¶ 28 Despite a prior determination by the Worker's Compensation Court that doing so was a violation of the ORPC, Wilcox advanced funds to Love to cover travel to her medical examinations rather than seek timely reimbursement for her from the insurer. His justification appears to be that the Order of the Workers' Compensation Court was issued in another case, not Love's, but this does not change the fact that he was put on notice that his conduct might violate the rules and yet made no effort to change his actions or determine whether he was complying with the requirements of the ORPC.

¶ 29 Wilcox also argues, as discussed above, that he lacked the time to seek reimbursement and that because Love would call him a few days before each appointment needing money, his advancement of funds was necessary for her to receive treatment. However, in *State ex rel. Oklahoma Bar Ass'n v. Smolen*, 2000 OK 95, ¶¶ 14–17, 17

---

**3.** The language of Rule 1.8(e) was altered when the rule was amended effective January 1, 2008, but the overall substance of the rule remains the same. The current version of the Rule 1.8(e), ORPC, 5 O.S. Supp.2008, Ch. 1, App. 3–A provides:

> (e) A lawyer shall not provide financial assistance to a client in connection with pending or contemplated litigation, except that:
>
> (1) a lawyer may advance court costs and expenses of litigation, the repayment of which may be contingent on the outcome of the matter; and
>
> (2) a lawyer representing an indigent client may pay court costs and expenses of litigation on behalf of the client.

P.3d 456, this Court declined to carve *ad hoc* exceptions into Rule 1.8(e) based upon an attorney's good intent or humanitarian purpose. The Court in *Smolen* detailed the history and reasoning behind Rule 1.8(e):

[t]he rule against attorneys providing financial assistance to clients for living expenses is based on the common-law prohibitions against practice of champerty and maintenance. The evils associated with champerty and maintenance intended to be prevented by rule 1.8(e)'s prohibition are: (1) clients selecting a lawyer based on improper factors, and (2) conflicts of interest, including compromising a lawyer's independent judgment in the case and creating the potentially conflicting roles of the lawyer as both lawyer and creditor with divergent interests. (Internal footnotes omitted).

*Smolen,* 2000 OK 95, ¶ 15, 17 P.3d 456.

The Court in *Smolen* further stated that "a rule allowing lawyers to make loans to clients for reasons other that [sic] advancing litigation expenses and court costs is ill-advised", in part because of the potentially inherent abuses in allowing lawyers to do so. *Smolen,* 2000 OK 95, ¶ 21, 17 P.3d 456. We agree, and hold that by advancing funds to Love for travel to medical appointments related to her injury, Wilcox violated Rule 1.8(e) of the ORPC.

### 3) Rule 1.15 of the ORPC

¶ 30 The OBA also asserts that Wilcox violated Rule 1.15 when he failed to safekeep client funds, and caused client funds to be comingled with his mother's funds, by endorsing Love's name on her temporary total disability checks and depositing them into his mother's bank account. Rule 1.15, ORPC, 5 O.S. Supp.2001, Ch. 1, App. 3–A provides in pertinent part:

(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained in the state where the lawyer's office is situated, or elsewhere with the written consent of the client or third person. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

(c) When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved

¶ 31 The PRT determined that the OBA did not demonstrate by clear and convincing evidence that Wilcox violated Rule 1.15 by endorsing certain temporary total disability checks and depositing them into his mother's personal checking account, for much the same reason it determined there was not clear and convincing evidence that Wilcox violated Rules 1.1 and 1.3 of the ORPC. According to the record, Wilcox testified that he endorsed and cashed Love's temporary total disability checks and retained the funds with his client's permission, as reimbursement for the travel expenses he had loaned to her. Love, on the other hand, testified that she does not remember making that agreement, and testified that Wilcox was not authorized to sign her name, cash the checks, and retain the funds. Because it had doubts about Love's memory, the PRT did not find Love's testimony alone sufficient to serve as clear and convincing evidence that Wilcox violated the rule.

¶ 32 However, as the OBA points out, Wilcox not only endorsed and deposited some of Love's temporary total disability checks as reimbursement for the money he paid her for travel; he also afterward sought reimbursement for the same advancements in front of the Workers' Compensation Court. Complainant's Exhibit 12. Specifically, in its Order Awarding Attorney Fees the Workers' Compensation Court determined that:

Respondent/insurance carrier continued sending MR. WILCOX claimant's temporary total disability checks for nine (9) weeks after claimant was released. MR. WILCOX endorsed claimant's name to five (5) of those checks without authorization and deposited them into his mother's account, claiming he was reimbursing himself for monies advanced to claimant. However, he is now seeking reimbursement for the same advancements. MR. WILCOX returned the other four (4) temporary total disability checks to the insurance carrier.

As the OBA correctly points out, the issue with Rule 1.15 is not whether Wilcox, in the end, might have been entitled to the monies as reimbursement. The issue is what he did with the money while his interest vs. Love's interest was in dispute.

¶ 33 This Court has specifically examined the application of Rule 1.15 to temporary total disability checks retained by an attorney previously, in one of Wilcox's prior disciplinary proceedings before this Court. In *Wilcox II*, 2009 OK 81, ¶¶ 13–14, 227 P.3d 642, this Court stated:

Rule 1.15(c) required: "When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests." **The Workers' Compensation Court found that Respondent had a recognizable lien on the workers' compensation proceeds,** that the available funds were insufficient to fully satisfy the competing liens, and that Respondent had "advanced claimant sums in the amount of $704.61 for prescription medicine and there [was] no evidence said amount was reimbursed by [Sadler]." The same order also

found that Respondent was entitled to $2,529.00 in attorney fees. Under the Worker's Compensation Court's order, the total to which Respondent had a claim from the funds represented by the checks was $3,233.61. Contrary to the Worker's Compensation Court's order, the OBA takes the position in its brief that Respondent had no claim to the funds represented by the two TTD checks. The OBA did not provide clear and convincing evidence that Respondent did not rightly claim an interest in the funds represented by the two TTD checks.

Having found that the OBA did not provide evidence that Respondent did not rightly claim an interest in the funds represented by the two TTD checks, we turn to Rule 1.5(c) to determine if he was required to hold them in a trust account. While Rule 1.15(a) of both the 2001 and the 2008 ORPC requires a lawyer to hold a client's funds in a trust account, there is no such provision in Rule 1.15(c) of the 2001 ORPC, which deals specifically with property in which the lawyer claims an interest. Rather, Rule 1.15(c) of the 2001 ORPC required that client funds be kept separate from the lawyer's. Further, the comments to Rule 1.15 of the 2001 ORPC, in effect at the time of Respondent's alleged misconduct, provided: "If there is risk that the client may divert the funds without paying the fee, the lawyer is not required to remit the portion from which the fee is to be paid." Thus, as we construe Rule 1.15 of the 2001 ORPC, Respondent was not specifically required to remit the two TTD checks and was not required to hold them in a trust account. **In compliance with Rule 1.15(c) of the 2001 ORPC, Respondent kept the two checks separate from his own property. Thus, we do not find that the OBA proved by clear and convincing evidence that Respondent violated Rule 1.15(c) of the 2001 ORPC.** (Emphasis added).

In contrast to the situation described above, in this instance: 1) the Worker's Compensation Court determined that Wilcox **did not** have a valid claim on the funds; and 2) while Wilcox did keep the checks separate from his own property, he deposited them in his moth-

er's checking account, and those funds were depleted within one month of deposit. Complainant's Exhibit 10. It is our determination that Wilcox violated Rule 1.15 of the ORPC by failing to keep safe client funds.

### 4. Rule 8.4(c) of the ORPC

■ ¶ 34 The OBA also asserts that Wilcox violated Rule 8.4(c) of the ORPC when he wrongly endorsed his client's name on her temporary total disability checks, failed to inform her he was keeping the checks, and made misrepresentations to the Workers' Compensation Court concerning his payments to Love's treating physicians. Rule 8.4(c) was not altered by the January 1, 2008 amendments to the ORPC, and provides:

> It is professional misconduct for a lawyer to:
>
> . . .
>
> (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

■ ¶ 35 We agree with the PRT that the OBA has not shown by clear and convincing evidence that Wilcox violated Rule 8.4(c). Rule 8.4(c) has an intent requirement. This Court has previously stated, in *State ex rel. Oklahoma Bar Ass'n v. Besly*, 2006 OK 18, ¶ 42, 136 P.3d 590, that conduct:

> does not rise to a Rule 8.4(c) violation, unless the record clearly and convincingly shows respondent had an intent or purpose to deceive when she made the representations.

The declarant must have had an underlying motive, such as bad or evil intent, for making the statement, and this requirement is not satisfied by negligent misrepresentation or failure to apprise another of relevant information. *Besly*, 2006 OK 18, ¶ 43, 136 P.3d 590; *State ex rel. Oklahoma Bar Ass'n v. Taylor*, 2003 OK 56, 57 17, 71 P.3d 18. An examination of the record reveals that Wilcox engaged in, at best, questionable recordkeeping and accounting practices, but there is not clear and convincing evidence that he possessed an intent to deceive either Love or the Workers' Compensation Court.

### 5. Rule 3.3(a)(3) of the ORPC

■ ¶ 36 The OBA also asserts in its complaint that Wilcox violated Rule 3.3(a)(3)

of the ORPC. Rule 3.3 of the Oklahoma Rules of Professional Conduct, 5 O.S. Supp. 2008, Ch. 1, App. 3–A, provides in pertinent part:

> (a) A lawyer shall not knowingly:
>
> . . .
>
> (3) offer evidence that the lawyer knows to be false. If a lawyer, the lawyer's client, or a witness called by the lawyer, has offered material evidence and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal. A lawyer may refuse to offer evidence that the lawyer reasonably believes is false.

The thrust of the OBA's claim is that Wilcox violated this rule when he asserted to the Workers' Compensation Court that: 1) he had advanced travel expenses to Love; and 2) represented to the Workers' Compensation Court that he had paid medical expenses to three of Love's treating physicians.

¶ 37 The PRT determined that the OBA failed to demonstrate by clear and convincing evidence that Wilcox violated Rule 3.3(a)(3). An examination of the record reveals that the PRT's determination was correct. In its report, the PRT actually hits the nail on the head as to why. It determined: "[g]iven Ms. Love's testimony, while respondent's bookkeeping and accounting practices are obviously extremely poor (or completely lacking), there is no evidence suggesting Respondent's request at the fee hearing for reimbursement of funds he advanced Ms. Love was knowingly false." Report of the Professional Responsibility Tribunal, p. 15. The PRT is correct that failure to provide sufficient evidence to the Workers' Compensation Court to back up his claims is not the same thing as offering evidence that Wilcox knew to be false. Wilcox's poor bookkeeping practices indicate the he may himself not have known what reimbursement he was supposedly owed or entitled to, and while that is in its own way a source of concern, it is not part of the disciplinary proceedings before this Court and does not prove by clear and convincing evidence that Wilcox offered evidence to the Workers' Compensation Court he knew to be false.

## 6. Rule 1.3 of the RGDP

¶ 38 The OBA also asserted in its complaint that Wilcox violated Rule 1.3 of the RGDP, 5 O.S.2001, Ch. 1, App. 1–A. The rule provides:

> The commission by any lawyer of any act contrary to prescribed standards of conduct, whether in the course of his professional capacity, or otherwise, which act would reasonably be found to bring discredit upon the legal profession, shall be grounds for disciplinary action, whether or not the act is a felony or misdemeanor, or a crime at all. Conviction in a criminal proceeding is not a condition precedent to the imposition of discipline.

The PRT determined that Wilcox's violation of Rule 1.8(e) of the ORPC was not sufficient to support a finding that Wilcox violated Rule 1.3 of the RGDP, but determined that Wilcox violated this rule by way of his conviction for stalking.

¶ 39 As discussed above, Wilcox engaged in conduct that violated Rules 1.1, 1.3, 1.8(e), and 1.15 of the ORPC. Over the course of his representation of Love, Wilcox failed to seek reimbursement for travel expenses to which she was entitled, and instead loaned her money himself. After doing so, he kept some of Love's TTD checks as reimbursement, which he endorsed and deposited into his Mother's checking account, failing to safe keep his client's funds until any dispute over who was entitled to them could be resolved. Though Wilcox argued he planned to seek reimbursement from the insurer on Love's behalf, the record reveals he was in no way prepared to properly do so.

¶ 40 By committing multiple violations of the ORPC, Wilcox has once again brought discredit upon the legal profession and committed acts contrary to prescribed standards of conduct in the course of his professional capacity. In doing so he has made himself subject to discipline pursuant to Rule 1.3 of the RGDP. Further, we agree with the determination of the PRT that Wilcox also subjected himself to discipline under this rule by stalking the wife of a judicial officer, discussed in detail below.

## III.

### OKLAHOMA BAR ASSOCIATION v. TOM J. WILCOX, SCBD 5775—RULE 7

#### A. Facts and Procedural Background

¶ 41 On April 2, 2011, Wilcox was found guilty of one count of stalking in violation of 21 O.S. 1173(A), in *State of Oklahoma v. Wilcox*, District Court of Dewey County, No. CM–2009–206. Wilcox was sentenced to six months in the Dewey County Jail, and ordered to pay a $1,000 fine. On June 27, 2011, this Court was notified of Wilcox's conviction by the OBA.

¶ 42 As a result of Wilcox's conviction, on June 30, 2011 this Court entered an Order of Immediate Suspension pursuant to Rule 7.3 of the RGDP, 5 O.S. Supp.2007 Ch. 1, App. 1–A, immediately suspending Wilcox from the practice of law until further order of this Court. *State of Oklahoma ex rel. Oklahoma Bar Association v. Wilcox*, 2011 OK 70, 261 P.3d 605. Also pursuant to Rule 7.3, Wilcox was directed to show cause by July 11, 2011, why, if good cause is shown, the suspension should be set aside. On July 11, 2011, Wilcox filed a response to the show cause directive that good cause exists and that this Court's Order of Immediate Suspension should be set aside. This court entered an order denying Wilcox's request to set aside the Order of Immediate Suspension on July 14, 2011.

¶ 43 The Court of Criminal Appeals affirmed Wilcox's conviction by Summary Opinion on July 5, 2012. *Thomas Joseph Wilcox v. The State of Oklahoma*, No. M–2011–270. Pursuant to Rules 7.4 and 7.5 of the RGDP, 5 O.S. Supp.2007 Ch. 1, App. 1–A, on December 3, 2012, this Court issued an Order directing Wilcox to show cause, no later than December 21, 2012, why a final order of discipline should not be made. Wilcox timely responded on December 20, 2012, and requested a hearing pursuant to Rules 7.4 and 7.5 of the Rules Governing Disciplinary Proceedings, 5 O.S. Supp.2007 Ch. 1, App. 1–A, for the purpose of showing cause in mitigation of the discipline to be imposed upon him.

¶ 44 On December 27, 2012, this Court granted Wilcox's request for a hearing on the limited scope of mitigation and recommendation of discipline to be imposed, and directed the PRT to hold the hearing within thirty days. The hearing was continued more than once, and on May 10, 2013, the OBA moved to join or consolidate this matter with its Rule 6 complaint against Wilcox, discussed supra, alleging specific acts of professional misconduct pursuant to Rule 6 of the RGDP, 5 O.S. Supp.2007 Ch. 1, App. 1–A, in *State of Oklahoma ex rel. Oklahoma Bar Association v. Thomas J. Wilcox*, SCBD 6009. The matters were joined for the purpose of the hearing.

## B. Analysis

¶ 45 In *State ex rel. Oklahoma Bar Ass'n v. Armstrong*, 1990 OK 9, 791 P.2d 815, this Court recognized that not every criminal conviction, by itself, demonstrates a lawyer's unfitness to practice law. We stated:

[a]lthough a lawyer is personally answerable to the entire criminal law, a lawyer should be professionally answerable only for offenses that indicate lack of those characteristics relevant to law practice. Offenses involving violence, dishonesty or breach of trust, or serious interference with the administration of justice are in that category. A pattern of repeated offenses, even ones of minor significance when considered separately, can indicate indifference to legal obligation.

*Armstrong*, 1990 OK 9, ¶ 8, 791 P.2d 815 (quoting Comment, Rule 8.4 of the Rules of Professional Conduct, 5 O.S. Supp.1988 Ch. 1, App. 3–A.).

Implicit in this Court's Order of Immediate Interim Suspension issued on June 27, 2011, is a decision that Wilcox's conviction facially demonstrated his unfitness to practice law. *State ex rel. Oklahoma Bar Ass'n v. Cooley*, 2013 OK 42, ¶ 11, 304 P.3d 453. However, we will once again examine Wilcox's conduct to determine the appropriate final discipline. *Cooley*, 2013 OK 42, ¶ 11, 304 P.3d 453.

¶ 46 At first glance, Wilcox's conviction appears relatively simple: on April 1, 2011, Wilcox was convicted of stalking Taunia Bo-

zarth, in violation of 21 O.S. 1173(A), which provides:

A. Any person who willfully, maliciously, and repeatedly follows or harasses another person in a manner that:

1. Would cause a reasonable person or a member of the immediate family of that person as defined in subsection F of this section to feel frightened, intimidated, threatened, harassed, or molested; and

2. Actually causes the person being followed or harassed to feel terrorized, frightened, intimidated, threatened, harassed, or molested, upon conviction, shall be guilty of the crime of stalking, which is a misdemeanor punishable by imprisonment in a county jail for not more than one (1) year or by a fine of not more than One Thousand Dollars ($1,000.00), or by both such fine and imprisonment.

Wilcox received a six-month sentence in the county jail, where he served 184 days, and was ordered to pay a $1,000 fine. The individual Wilcox was convicted of stalking, Taunia Bozarth, was and remains the wife of Dewey County Associate District Judge Rick Bozarth. As mentioned above, Wilcox appealed his conviction, which was then affirmed by a summary opinion of the Court of Criminal Appeals on July 5, 2012.

¶ 47 This Court previously examined the appropriate discipline for an attorney convicted of stalking in violation of 21 O.S. 1173 in *State ex rel. Oklahoma Bar Ass'n v. Shanbour*, 2003 OK 116, 84 P.3d 107. In that disciplinary proceeding, we determined that an attorney's criminal conviction for one count of stalking in violation of 21 O.S. 1173 and nine felony counts of either distribution or attempted distribution of obscene or indecent material in violation of 21 O.S. 1021 warranted disbarment from the legal profession. *Shanbour*, 2003 OK 116, ¶ 0, 84 P.3d 107. In *Shanbour*, this court primarily emphasized the attorney's distribution of obscene materials to the minor child of his stalking victim in making a determination that disbarment was the appropriate discipline.

¶ 48 However, this Court also stressed the important considerations that it must take into account in this type of situation, stating:

"In determining the proper discipline this Court compares the circumstances of the involved case with those of similar previous disciplinary cases involving other attorneys and we examine the respondent's previous disciplinary record—both inquiries geared to determining how best to serve the welfare of the public and the integrity of the bar. [*State ex rel. Oklahoma Bar Ass'n v.*] *Meek, supra*, 895 P.2d [692] at 700 [ (Okl.1994) ]. Also, to arrive at appropriate discipline, a fit factor to consider is the deterrent effect upon both the offending respondent and other attorneys who might contemplate similar conduct in the future. *State ex rel. Oklahoma Bar Ass'n v. McMillian*, 1989 OK 16, 770 P.2d 892, 899; *State ex rel. Oklahoma Bar Ass'n v. Hall*, 1977 OK 117, 567 P.2d 975, 978. Mitigating circumstances are also often considered when assessing the appropriate measure of discipline. *State ex rel. Oklahoma Bar Ass'n v. Thomas*, 1995 OK 145, 911 P.2d 907, 913. Also, although discipline should be administered fairly (i.e., evenhandedly), this Court has recognized that the extent of discipline must be decided on a case-by-case basis because each situation will usually involve different transgressions and different mitigating circumstances. *See State ex rel. Oklahoma Bar Ass'n v. Rozin*, 1991 OK 132, 824 P.2d 1127, 1130. (Paragraph numbers omitted.)"

*Shanbour*, 2003 OK 116, ¶ 4, 84 P.3d 107 (quoting *State ex. rel. Oklahoma Bar Ass'n v. Shofner*, 2002 OK 84, ¶¶ 4–6, 60 P.3d 1024).

Here, Wilcox stalked the wife of a judicial officer. The record shows he intimidated her, and she became afraid to drive into the Town of Seiling. She testified that she stopped going to the gym, playing golf, or grocery shopping in Seiling.

¶ 49 For the purposes of determining Wilcox's fitness to practice law, his conviction for stalking cannot be viewed in isolation. Wilcox has been previously subjected to discipline by this Court for, among other things, violating Rule 8.2 of the Oklahoma Rules of Professional Conduct, which prohibits a lawyer from making a false statement about a judicial candidate with knowledge or with reckless disregard of the statement's truth. *Wilcox II*, 2009 OK 81, ¶¶ 58–59, 227 P.3d 642. The candidate in question was Taunia Bozarth's husband, Rick Bozarth, who is currently the Associate District Judge for Dewey County. Further, the record indicates that the first instance of stalking that gave rise to Wilcox's conviction was April 20, 2009, which is the date of Wilcox's hearing before the PRT concerning his statements regarding Judge Bozarth during the campaign. Complainant's Exhibit 7.

¶ 50 Concerning the gravity of Wilcox's actions, we find the PRT's language particularly apt: "[r]espect for judicial and quasi-judicial proceedings is the very foundation of the practice of law. Intentional intimidation of those involved in legal proceedings—or worse yet, victimizing their families—is serious indeed." Report of the PRT, p. 28 By way of mitigation, Wilcox asserts long-standing bad blood and harassment between himself and other individuals in the City of Seiling, including Taunia Bozarth and Judge Bozarth, the Dewey County Sheriff, and police officers of the City of Seiling.

¶ 51 We agree with the PRT that bad blood and disagreement between individuals does not justify the crime of stalking. Further, the fact that Wilcox asserted he refrained from committing worse crimes, such as assault or verbally threatening Taunia Bozarth, hardly serves as evidence mitigating the crime of which Wilcox was convicted. Transcript, pp. 84–85.[4] Much of the testimo-

---

4. During the hearing, Wilcox was asked:
   Q: From the complaints that were made against you, sir, in the criminal case as well as the victims protection order that was issued and then reversed against you, can you tell us, was there ever any complaint that you had any kind of a weapon on you at any of those times?
   A: Never. I don't—I don't have any weapon including pocketknives.
   Q: Was there ever any claim of any assaultive behavior, you offering to do bodily harm to any of these people making any complaint?
   A: Never.
   Transcript, pp. 84–85.

ny offered by Wilcox as mitigation consists of denials that he stalked Taunia Bozarth. Wilcox testified: "I still don't believe I ever stalked that lady. You keep using this word 'stalk'". Transcript, p. 58. He also stated: "[w]ell, I don't agree with the jury verdict or the court of—the Court of Criminal Appeals' decision. I'll abide by the punishment, and that's where I'm at." Transcript, p. 56. Wilcox responded again in the same manner when asked if he was willing to take any responsibility:

Q: Do you take any responsibility for the conviction for stalking Taunia Bozarth?

A: I disagree with the jury's decision, I disagree with the Court of appeals—criminal—court of criminal appeals decision [sic], but I've done my punishment or I'm doing it now.

Transcript, p. 60.

¶ 52 Wilcox has already had an opportunity to appeal his conviction, which has now become final. These proceedings are not the proper place for Wilcox to attempt to collaterally attack his conviction. *State ex rel. Oklahoma Bar Ass'n v. Brunson,* 1996 OK 32, ¶¶ 10–11, 912 P.2d 876. Finally, it is absolutely clear from Wilcox's testimony that he has no remorse for his actions concerning Taunia Bozarth. Transcript, pp. 162–64. Wilcox was asked specifically during the hearing:

Q: Mr. Wilcox, is the answer you don't have any remorse for Ms. Bozarth?

A: I can't think of any.

Transcript, p. 163.

¶ 53 Given that Wilcox was previously subjected to discipline by this Court for making reckless statements about Judge Bozarth, Taunia Bozarth's husband, while he was a candidate for judicial office in violation of Rule 8.2(a) of the ORPC, and from the record, almost immediately afterwards began the conduct that would lead to his conviction for stalking Taunia Bozarth, Wilcox's lack of respect for the law and the judicial office is clear.

## IV.
### Conclusion

¶ 54 The purpose of disciplinary proceedings is not to punish, but to assess an attorney's continued fitness to practice law. *State ex rel. Oklahoma Bar Ass'n v. Garrett,* 2005 OK 91, ¶ 3, 127 P.3d 600; *State ex rel. Oklahoma Bar Ass'n v. Taylor,* 2003 OK 56, ¶ 22, 71 P.3d 18. It is also this Court's responsibility to impose discipline to safeguard the interests of the public, the courts, and the legal profession. *Garrett,* 2005 OK 91, ¶ 3, 127 P.3d 600; *Taylor,* 2003 OK 56, ¶ 22, 71 P.3d 18. Before arriving at appropriate discipline, however, we must also consider the deterrent effect upon both the offending respondent and other attorneys who might contemplate similar conduct in the future. *Taylor,* 2003 OK 56, ¶ 22, 71 P.3d 18; *State ex rel. Oklahoma Bar Ass'n v. McMillian,* 1989 OK 16, ¶ 24, 770 P.2d 892. It is also appropriate for this Court to compare the circumstances in the matter at hand with previous disciplinary matters, and for this Court to examine an attorney's past record of professional behavior. *Taylor,* 2003 OK 56, ¶ 22, 71 P.3d 18; *State ex rel. Oklahoma Bar Ass'n v. Doris,* 1999 OK 94, ¶ 38, 991 P.2d 1015. Although discipline should be administered fairly (i.e.evenhandedly), this Court has recognized that the extent of discipline must be decided on a case-by-case basis because each situation will usually involve different transgressions and different mitigating circumstances. *Doris,* 1999 OK 94, ¶ 38, 991 P.2d 1015.

¶ 55 After consideration of the evidence, the PRT recommended Wilcox be suspended from the practice of law for two years and one day. In light of the seriousness of Wilcox's actions, his previous disciplinary history, and the mitigating circumstances he presented, we are forced to reach the conclusion that disbarment is the only suitable discipline. This Court has an obligation to safeguard the interest of the public, the courts, and the legal profession, as well as to preserve public confidence in the bar. *State ex rel. Oklahoma Bar Ass'n v. Moon,* 2012 OK 77, ¶ 26, 295 P.3d 1. Wilcox's repeated disciplinary issues, culminating in the stalking of a Judge's family member, severe-

ly undermine that confidence. Wilcox has shown no remorse, and instead has repeatedly insisted that his conduct was not criminal, despite his conviction.

¶ 56 The nature of Wilcox's conviction for stalking the wife of a sitting judge suggests a lack of respect for the judiciary, and Wilcox's history of repeated violations of the ORPC reveals a lack of respect for ethical requirements necessary to ensure the public's confidence in the integrity of the bar. An examination of the evidence compels the conclusion that Wilcox is not fit to practice law. It is therefore ordered by this Court that Respondent, Thomas Joseph Wilcox, is disbarred from the practice of law in Oklahoma and that his name is stricken from the roll of attorneys. The disbarment is to be effective from the date Wilcox received his interim suspension on June 30, 2011.

¶ 57 The Oklahoma Bar Association has moved for an assessment of costs against Wilcox in the amount of $4,935.22. Pursuant to Rule 6.16 of the RGDP, 5 O.S.2011 Ch. 1, App. 1–A, when discipline results, the Oklahoma Bar Association is entitled to be reimbursed for the cost of the investigation, the record, and disciplinary proceedings. However, this Court does not find it appropriate to assess as costs the amount the members of the PRT spent on lunch during the two days of the hearing. As a result, the amount of $82.20 is deducted, and Wilcox is ordered to pay costs of the proceedings in the amount of $4,853.02 not later than ninety days from the date this opinion becomes final.

**RESPONDENT DISBARRED AND HIS NAME IS STRICKEN FROM THE ROLL OF ATTORNEYS, THE DISBARMENT TO BE EFFECTIVE FROM THE DATE RESPONDENT WAS SUSPENDED BY THIS COURT'S JUNE 30, 2011 ORDER; COSTS IMPOSED.**

¶ 58 ALL JUSTICES CONCUR.